1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9              **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11 DONALD RICO and ANTHONY BOJORQUEZ, | Case No. 09cv02684 BTM (WVG) |
| 12 Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION FOR** |
| 13 v. | **SUMMARY JUDGMENT** |
| 14 COUNTY OF SAN DIEGO, et al., | |
| 15 Defendants. | |

16

17          Defendant Anthony Tripoli ("Tripoli" or "Defendant") has filed a motion for

18    summary judgment.  For the reasons discussed below, Defendant's motion is

19    **DENIED.**

20

21                          **I.  BACKGROUND**

22          This case arises out of the shooting of Plaintiffs Donald Rico ("Rico") and

23    Anthony Bojorquez ("Bojorquez") by Deputy Tripoli ("Tripoli") after a brief car

24    chase near the Pauma Indian Reservation in the early morning hours of

25    December 5, 2008.  Plaintiffs, both of whom survived the December 5, 2008

26    incident, bring claims for excessive force and false arrest under the Fourth

27    Amendment, as well as state law negligence and battery claims.

28    ///

A.    Events Leading Up to Car Chase

At approximately 3:00 a.m. on the morning of December 5, 2008, Deputy Tripoli and two other Sheriff's Deputies – Wizniewski and Power – set out to arrest non-party Ryan Rico (the brother of Plaintiff Donald Rico) on an outstanding felony warrant for evading a peace officer. (Tripoli Trial Testimony[1] (Def. Ex. E) 236:10-18; Wizniewski Trial Testimony (Def. Ex. F) 30:2-25.) The deputies proceeded in two marked Sheriff's patrol Ford Expeditions. Wizniewski drove one Expedition by himself, while Power drove the other Expedition with Tripoli riding in the front passenger seat. (Def. Undisputed Fact ("DUF") ¶ 2.)  Before setting out, Wizniewski told Tripoli, "[I]f we find him, he may run from us," and "the last time he was arrested there was a shotgun nearby him." (Wizniewski Trial Testimony 30:5-7.)

Shortly after setting out, the three deputies drove west on SR-76, with Deputies Power and Tripoli in the lead vehicle. (Tripoli Trial Testimony 239:14-16.) The deputies approached the intersection of SR-76 and Magee Road and slowed down, intending to make a right turn on Magee, at which point Tripoli spotted a car matching the description of Ryan Rico's black El Camino stopped on Magee Road and apparently waiting to make a turn onto SR-76.  (Tripoli Trial Testimony 239:16-25.) Directly behind the El Camino was a "dark colored SUV." Id.  The SUV turned out to be a 1997 Jeep Grand Cherokee Laredo (the "Jeep"), driven by Ryan Rico's brother, Plaintiff Donald Rico, with Plaintiff Anthony Bojorquez in the front passenger seat.  (DUF ¶ 6.)

Power activated the Expedition's overhead lights, and Tripoli started to get out of the vehicle to contact and arrest Ryan Rico.  (Tripoli Trial Testimony 239:24-240:4.)  At this point, the El Camino made a right hand turn onto SR-76 in front of Power and Tripoli and fled west.  (Id. at 240:8-10.)

---

[1] "Trial Testimony" cited by the Court is testimony introduced in criminal proceedings against Plaintiff Donald Rico in the Superior Court of California, County of San Diego (People of the State of California v. Donald Rico, Case No. SCN258028).

B.    The Car Chase

After the El Camino turned onto SR-76, Wizniewski maneuvered around Power and Tripoli's Expedition, followed the El Camino on SR-76, and passed in front of the El Camino. (Tripoli Trial Testimony 240:19-22.) Tripoli and Power followed behind the El Camino. (Id. at 240:22-28.) Plaintiffs' Jeep fell in behind Tripoli and Power. (Id. at 240:27-28.)

All four cars headed west on SR-76, with the El Camino eventually passing Wizniewski, to become the lead vehicle. (Power Trial Testimony 169:7-11.) The deputies reached speeds between 60 and 70 miles per hour. (DUF ¶ 11.) At 3:16:38 a.m., Tripoli radioed that he had a "failure to yield." (DUF ¶ 14.) Plaintiffs' Jeep followed Power and Tripoli's Expedition at a distance of "about two car lengths." (Rico Dep. 30:21-31:12; Bojorquez Dep. (Doc. 29-2, Ex. L) 28:25-29:2.) Power could see the headlights of the Jeep in the Expedition's rearview mirror, and he stated to Tripoli: "Somebody is on our ass." (Power Trial Testimony 170:24-171:21.)

The chase proceeded on SR-76 for only about half a mile before the El Camino turned right onto an unlit, bumpy, dirt road and began heading north to Rico's aunt's house. (DUF ¶¶ 11, 16, 18.) The three other cars also turned onto the dirt road and the pursuit continued at speeds reaching 40 to 50 miles per hour. (DUF ¶ 17.) The progress of the vehicles down the bumpy dirt road stirred up dust, and visibility was poor. (DUF ¶ 19-20.)

Power again saw headlights in his rearview mirror, and stated: "Oh, shit there they are again." (Power Trial Testimony 173:1-16.) Power believed that the headlights belonged to the same vehicle that had followed him and Tripoli moments earlier on SR-76, and Power thought he was being led into an ambush. (Id. 173:17-24.)

The car chase reached an abrupt halt when the El Camino reached a closed iron gate behind Rico's aunt's house. (Rico Dep. 33:10-18.) The entire

09cv02684 BTM (WVG)

1   chase lasted approximately one minute.  (DUF ¶ 26.)

2

3   C.   The Shooting

4        The vehicles all "slamm[ed] on their brakes" when the El Camino reached
5   the iron gate.  (Bojorquez Dep. 32:15-18.)   A diagram prepared by Criminalist
6   Carolyn Gannett shows how the El Camino and deputies' vehicles were
7   positioned with respect to the gate and the dirt road that the cars used to enter
8   the property from the west.  (Ex. C to Gannett Decl. – **attached to this Order**
9   **as Ex. 1**.)

10       After his car stopped, Ryan Rico got out of his car and ran off into the
11  darkness.  (DUF ¶ 25.)  Deputy Wisniewski got out of his Expedition and ran
12  after Ryan.  (DUF ¶ 25.)  Power and Tripoli came to a stop behind Wizniewski's
13  Expedition, and the Jeep slid next to the driver's side of Power and Tripoli's
14  Expedition, at a distance of approximately one foot.  (DUF ¶ 28.)  As Power
15  attempted to exit the Expedition and enter the foot pursuit, his door struck the
16  Jeep, forcing him back inside the Expedition.  (Power Trial Testimony 174:15-
17  26.)

18       Within a few seconds of stopping the Jeep beside Power and Tripoli's
19  Expedition, Rico shifted into reverse and quickly backed away from the vehicle.
20  (Rico Dep. 36:7-12.)  As he reversed on the dirt road, his tires spun to gain
21  traction, and the front right (passenger) side of the Jeep clipped the rear left
22  (driver) side of the Expedition.  (Rico Dep. 36:13-15; Bojorquez Dep. 35:22-
23  36:2.)  It is unclear whether Tripoli was aware that the Jeep had made contact
24  with his vehicle.  During his interview on the day of the incident, Tripoli claimed
25  that he looked over his left shoulder and saw the Jeep strike the left of the
26  driver's side rear panel of the vehicle as it moved forward.  (Tripoli Interview
27  (Ex. H) 16:15-18.)  However, during Rico's trial, he stated that he couldn't say
28  that he felt any particular contact between his vehicle and the Jeep and couldn't

recall a specific "collision point."  (Tripoli Trial Testimony 242:18-26.)

The Jeep backed up to a position approximately one to two car lengths behind the Expedition. (Rico Dep. 38:1-3.) As the Jeep reversed, Power exited his vehicle.  (Power Trial Testimony 176:8-10.)   He drew his weapon and walked back toward the rear of his vehicle.  (Id.)  Bojorquez saw Power with his weapon drawn.  (Bojorquez Trial Testimony 215:8-14; Bojorquez Dep. 39:6-13.) Rico then shifted back into drive and began moving forward and to the right, turning toward another dirt road (the "orchard road") that led southward and out of the property.   (Rico Dep. 38:7-10; Bojorquez Dep. 45:15-21.)   Rico's intention was to leave the scene via the orchard road because he was "in the wrong spot. (Rico Dep. 48:7-10.)  The Jeep arced behind the Expedition as it turned toward the orchard road.  A "close-up" diagram prepared by Ms. Gannett shows the location of the Jeep tracks relative to the Expedition.  (Ex. D. to Gannett Decl. – **attached to this Order as Ex. 2**.)  At the closest point, the tracks of the Jeep are just slightly more than 10 feet away from the right edge of the Expedition's rear bumper.  Bojorquez recalls that Rico was traveling at a speed of 10 to 15 miles per hour while pulling out and eventually sped up to 30 miles per hour.  (Bojorquez Dep. 48:15-25.)

At some point during the movement of the Jeep around the Expedition, Tripoli exited the Expedition on the passenger side and drew his weapon. Tripoli opened fire and discharged 16 shots in quick succession in the direction of the moving Jeep, emptying his weapon's magazine. (Tripoli Interview 55:14-17; DUF ¶ 51. )  It took slightly more than 3.5 seconds to fire the 16 shots. (DUF ¶ 52.)  The shots fired by Tripoli struck the side and rear of the Jeep. (Tsuida Dep. (Pl. Ex. 4) 51:18-21.)  No bullets entered through the front of the Jeep.  (Id. at 51:10-17.)

Scott Hoopes, a Criminalist for the San Diego County Sheriff Department who inspected the scene and performed a trajectory determination as well as

1   a "shooting incident reconstruction," concluded:

2       The Jeep Grand Cherokee Laredo . . . was struck by a minimum of
3       twelve (12) projectiles.  Of these projectiles, one (1) struck the
        vehicle while traveling primarily from driver's side to passenger's
        side, one (1) struck the vehicle while traveling from driver's side to
4       passenger's side at approximately a 45° angle from back to front,
        and ten (10) struck the vehicle while traveling primarily from back
5       to front.

6   (Ex. 55 to Hoopes Dep. (Pl. Ex. 5).)

7       According to Defendant's expert witness, Plaintiff Rico was struck by

8   Tripoli's first two shots, and Plaintiff Bojorquez was struck by either the fourth

9   or the fifth shot. (Martini Decl. ¶¶ 9-10.)  The three shots that struck Rico and

10  Bojorquez all entered from the left (driver) side of the Jeep.  (Id. ¶ 12)

11      After the shooting ceased, Plaintiffs completed their turn onto the orchard

12  road and continued southward.  (Rico Dep. 43:2-7.)

13

14  D.   Disputed Facts Regarding Shooting

15      The parties disagree over the details of the shooting.  Specifically, they

16  disagree about the position of the Jeep at the moment Tripoli exited the

17  passenger side of the Expedition, whether the Jeep ever moved directly toward

18  Tripoli or "tracked" his movements, and Tripoli's position when he began

19  shooting.

20

21      1.   Defendant's Account

22      According to Tripoli, after the Jeep  pulled up on the driver side of the

23  Expedition, Tripoli exited the front passenger door and began moving along the

24  passenger side of the Expedition toward the rear.  (Tripoli Trial Testimony

25  244:5-7.)  As Tripoli came around the rear side of his vehicle and drew his

26  weapon, he could see that the Jeep was in the process of backing up.  (Id. at

27  244:5-8.)

28      The  Jeep  backed  up  to  a  point  where  Tripoli  "was  facing  almost

6

1   essentially head on with the [Jeep]." (Id. at 244:8-11).  According to Tripoli, the

2   Jeep stopped 10 or 15 feet away from him with its headlights pointed at him.

3   (Id. at 246:17-20.)  At that moment, Tripoli pointed his gun at the Jeep's driver

4   (Rico), and ordered the Jeep's occupants to stop, get out of the vehicle, and

5   show their hands.  (Id. at 244:12-15.)  The Jeep's occupants did not respond

6   to these orders.  (Id. at 244:14-15.)

7       The Jeep began accelerating forward in Tripoli's general direction.  (Id.

8   at 244:16-21.)  Defendant's expert concludes, "It is probable and consistent

9   with the physical evidence that Tripoli was located in front of and in line with the

10  Jeep Cherokee prior to and during some of the Jeep's forward movement, at

11  an approximate distance of six to ten feet."  (Martini Decl. ¶ 7.)  As the Jeep

12  began moving forward, Tripoli moved to his right and perceived the Jeep's

13  headlights moving toward him and "tracking [his] movement."  (Tripoli Trial

14  Testimony 245:2-5.)   That was when Tripoli fired at the driver.  (Id.)  Tripoli

15  explains that he was afraid that he was going to get run over and killed and

16  feared for the lives of himself and Power.  (Id. at 245:7-25.)

17      According to Tripoli, the Jeep had accelerated to a speed of

18  approximately ten miles an hour as it passed him, giving him "less than a

19  second" to decide whether to open fire (Def. Mem. of P. & A at 5:17-21).  Thus,

20  even though he concedes that he fired at the side and rear of the Jeep – and

21  not at the front – he argues that he made the decision to fire when the Jeep

22  was heading *at* him, not while it was passing him by.

23      Tripoli's account of exactly where he was at the time he began shooting

24  varies.  During his  interview, Tripoli stated that the closest he got to the Jeep

25  during the shooting was five feet.  (Tripoli Interview 52:20-23.)  During Rico's

26  trial, however, Tripoli testified:

27

28      The [Jeep] started driving towards me.  And I started moving to my
        right.  **And at one point I'm kind of pinned up against the back**

7                                                        09cv02684 BTM (WVG)

**of my vehicle.  I can't get around any other side.**  And as I'm moving the vehicle appears to be tracking me and driving in my direction and that was when I fired at the driver.

(Tripoli Trial Testimony 244:16-21 (emphasis added).)  According to the trial testimony, Tripoli would have been pressed up against the Expedition's bumper and much farther than five feet from the Jeep.  Defendant's expert, however, concludes that Tripoli was located on the driver's side of the Jeep at distances of approximately two to seven feet for his first shots.  (Martini Decl. ¶ 8.) Martini's diagram positions Tripoli behind the Expedition at distances of approximately five to ten feet from the Expedition's bumper.  (Martini Decl. ¶ 12, Diagram 5.)

### 2.  Plaintiffs' Account

At his deposition, Rico testified that as he attempted to leave the scene, he looked ahead as he began moving forward and to the right, and he did not see Tripoli until he was already moving and Deputy Tripoli appeared to his left (driver) side.  (Rico Dep. 42:11-43:1.)  At that point, he saw  Tripoli open his door, get out, and then move toward the rear of the Expedition.  (Id. at 43:8-44:16.)

At his deposition, Rico indicated on the "close-up" diagram prepared by Gannett where his Jeep was located after it reversed and stopped (box marked with a "1"), where Tripoli moved to the rear of the Expedition (marked "X" and "D"), and where his Jeep was when he saw Tripoli in that location (box marked with "2").  (Ex. 1 to Rico Dep. – **attached to this Order as Ex. 3**.)  According to Rico, he did not see Tripoli as he was shooting at them but instantly heard gunshots after seeing Tripoli in the "X" position.(Rico Dep. 89:15-25.)  Rico states that the Jeep was still in position "2" when he heard the gunshots.  (Id. at 51:12-14.)

Bojorquez also testified at his deposition that he did not see Tripoli until

after Plaintiffs had started moving forward and to the right.  (Bojorquez Dep. 39:14-25.) He said that Tripoli was "even with the rear door on the passenger's side," and he believed that Tripoli's weapon was drawn.  (Id. at 18-22; 23-25.) Bojorquez does not recall ever seeing a deputy behind the Expedition.  (Id. at 65:13-17.)[2]

Power could not see Tripoli on the other side of the Expedition and did not know where Tripoli was when the shooting started.  (Power Trial Testimony 178:4-8; 191:6-12.)

Scott Hoopes, Cirminalist with the Sheriff's Department, prepared a shooting incident reconstruction report.  (Ex. 56 to Hoopes Dep.)  Hoopes concluded: "Based on the location of the cartridge cases at the scene and the totality of physical evidence, Deputy Tripoli was most likely standing to the rear

---

[2]  Defendant argues that Bojorquez's deposition testimony should be disregarded under the "sham affidavit rule," because it is contradicted by Bojorquez's prior sworn trial testimony.  The Court is not persuaded by this argument.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991). However, the inconsistency between the prior and later sworn testimony must be clear and unambiguous to justify striking the later testimony.  Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998-99 (9th Cir. 2009).  The inconsistency between Bojorquez's trial testimony and deposition testimony is not clear and unambiguous.  During his trial testimony, when asked if at some point he saw a sheriff's deputy with his weapon drawn, Bojorquez testified that he saw a sheriff's deputy come out of the driver's side door.  (Bojorquez Trial Testimony 215:8-14.)  The following exchange then occurred:

> Q: Okay.  And so you saw just the one Deputy coming out of the passenger's side door; is that your testimony today?
> A: Driver?
> Q: Driver.  Excuse   And with the weapon drawn?
> A.  Yes.

(Id. at 216:14-19.)

This testimony is not clearly inconsistent with Bojorquez's deposition testimony that he saw Tripoli on the other side of the Expedition as the Jeep pulled forward.  Bojorquez initially saw Power with his weapon drawn. During the exchange quoted above, Bojorquez arguably corrected counsel because they had just been discussing the deputy who came out of the driver's side, not the passenger's side.  In fact, only one deputy (Power) came out of the driver's side. It does not appear, based on the portions of the transcript before the Court, that Bojorquez was asked if he ever saw any other deputy outside of the Expedition before the shooting occurred.

of his vehicle at a range of approximately zero to twelve feet from the rear of the bumper when he fired at the Jeep Grand Cherokee Laredo.  Shots fired from this location were fired in a general southerly or southwesterly direction." (Incident Reconstruction Report at 4.)  Hoopes explained that due to the lack of impacts located in stationary objects at the scene, it was not possible to determined a fixed location for Tripoli at the time of any given shot.  (Id. at 2.) However, it was possible to determine a range of possible shooting locations based on the locations of expended cartridge cases and ejection pattern tests performed on Tripoli's firearm.  (Id.)  It was also possible to narrow the range of most likely shooting positions based on additional physical evidence at the scene.  (Id.)  Hoopes prepared a diagram showing the most likely location of Tripoli during the shooting (cross-hatched area).  (**Attached to this Order as Ex. 4**.) [3]

## II.  <u>STANDARD</u>

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Freeman v. Arpaio</u>, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S.

---

[3]   Defendant objects to the Hoopes report on the ground that Plaintiffs have not designated Hoopes as an expert.  However, the report may be admissible under Federal Rule of Evidence 803(8)(A)(iii), which provides a hearsay exception for a record or statement of a public office if it sets out factual findings from a legally authorized investigation.

at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proof at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.  Celotex, 477 U.S. at 314.  When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Defendant Tripoli moves for summary judgment on Plaintiffs' Fourth Amendment excessive force and false arrest claims under 42 U.S.C. § 1983, as well as Plaintiffs' state law negligence and battery claims, on the ground that "his use of deadly force was reasonable as a matter of law."  Alternatively, Tripoli contends he is entitled to qualified immunity because on December 5, 2008, it was not "clearly established" that his actions were in violation of the Fourth Amendment.  As discussed below, the Court denies Defendant's motion for summary judgment due to triable issues of material fact regarding the circumstances surrounding the shooting.  The same factual disputes prevent the Court from granting Defendant qualified immunity.

A.    Reasonableness of Deadly Force

Claims of excessive force are examined under the Fourth Amendment's

prohibition on unreasonable seizures.  Graham v. Connor, 490 U.S. 386, 394 (1989).  Under the Fourth Amendment, the use of deadly force is "reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Scott v. Henrich, 39 F.3d 912, 914 (9th Cir. 1994) (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)).

Officers' actions are evaluated under the standard of objective reasonableness.  Graham, 490 U.S. at 397.  "In assessing reasonableness, the court should give 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is attempting to evade arrest by flight.'"  Wilkinson v. Torres, 610 F.3d 546, 550 (9th Cir. 2010) (quoting Graham, 490 U.S. at 396).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.  Courts must allow for "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  Id. at 396-97.

The reasonableness inquiry in this case turns on whether a reasonable officer in Tripoli's position would have believed that his life or Power's life was in danger due to the approaching Jeep.  The Court must view the facts and draw reasonable inferences in the light most favorable to Plaintiffs.  Scott v. Harris, 550 U.S. 372, 378 (2007).  Viewing the facts in the light most favorable to Plaintiffs, a jury could conclude that a reasonable officer would not have believed he or anyone else was in danger at the time Tripoli made the decision to open fire on the Jeep.

The key dispute concerns where Tripoli was located when the Jeep

began arcing past the rear of the Expedition.  Tripoli claims that he was some distance behind the Expedition when the Jeep began moving forward in his general direction.  If this was the case, and Tripoli was in the open as the Jeep began accelerating forward, the Court would find that a reasonable officer could fear that the Jeep was trying to run him over.  Tripoli already thought that the deputies were being ambushed when the Jeep followed them up the dirt road and blocked the driver's side door.  In addition, the incident occurred during early morning hours in a secluded, dusty, and dark location.

However, according to Rico and Bojorquez, as their Jeep passed the rear of the Expedition, they saw Tripoli at the rear of the passenger side of the Expedition, not behind the Expedition.  Right after they saw Tripoli at this location, the shooting began.  According to Hoopes's analysis, Tripoli was located at a range of approximately zero to twelve feet from the rear of the bumper when he fired at the Jeep.  Accordingly, it is possible, under Plaintiffs' version of the facts, that Tripoli was standing at the rear of the passenger side of the Expedition when the Jeep started to pass the bumper of the Expedition; Tripoli then stepped out just past the Expedition's bumper and began firing on the Jeep as the Jeep continued to pass the Expedition and head toward the orchard road.  It is undisputed that no bullets were fired through the front of the Jeep.  According to Hoopes, a couple of bullets struck the Jeep from the driver's side going to the passenger's side, while the rest struck the vehicle from the rear, traveling toward the front.

Viewing the evidence in the light most favorable to Plaintiffs, Tripoli was not in any imminent danger when he decided to move beyond the bumper of the Expedition and begin firing, because he was not in the path of the Jeep, which, by that point, was turning in a south-easterly direction toward the orchard road, not toward the Expedition.  The Jeep's tracks to the orchard road form a smooth arc and do not show erratic movements to the side. Power, who

was on the driver's side of the Expedition, clearly was not in the path of the Jeep once the Jeep began its turn.[4]  Based on Plaintiffs' version of the facts, a jury could find that Tripoli chose to fire at the Jeep to prevent escape, not because he was reasonably in fear for his or Power's life.[5]

The cases Defendant cites in support of his position that his use of deadly force was reasonable are distinguishable.  In those cases, the undisputed facts established that the shooting officer was in the path of the approaching vehicle or that the vehicle was moving in close proximity to a fellow officer in a vulnerable state.

Unsurprisingly, courts have held that the use of deadly force by an officer is reasonable in cases where the officer is standing in the path of an oncoming vehicle driven by a noncompliant suspect.  See, e.g.,Thomas v. Durastanti, 607 F.3d 655 (10th Cir. 2010)  (officer "undoubtedly was in the Lincoln's path in a very confined area," and less than a second passed between the firing of the shots and the agent appearing on video on the hood of the Lincoln); Hathaway v. Bazany, 507 F.3d 312 (5th Cir. 2007) (officer could not get out of way of accelerating car, which hit the officer's left leg, causing him to spin down the side of his vehicle); Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005) (officer was standing in a narrow space between two vehicles, and the distance between the officer and the car was only two to four feet); Troupe v. Sarasota County, 419 F.3d 1160, 1168 (11th Cir. 2005) ("Bauer was directly in Hart's path as the Oldsmobile accelerated toward him.  He had only 3-5 seconds to assess the situation before shooting.")

---

[4]  Power testified that he did not fire on the Jeep after he exited the vehicle because they were backing away from him, and "I didn't perceive a threat to me at that time." (Power Trial Testimony 192:10-12.)

[5]  Defendant makes much of the fact that during his interview, Bojorquez stated that he could see how "the Sheriff" thought the Jeep was driving at him. (Bojorquez Interview 29:23-26.)  However, this testimony is vague and does not specify whether Bojorquez was talking about Power and/or Tripoli or what point in time Power and/or Tripoli could have thought the Jeep was driving at him/them.

1    Courts have also found the use of deadly force to be reasonable in cases

2   where the suspect's vehicle is moving in close proximity to a fellow officer in a

3   vulnerable position.  For example, in  Wilkinson v. Torres, 610 F.3d 546 (9th

4   Cir. 2010), the suspect's minivan was accelerating around Officer Torres in a

5   muddy, slippery yard, and Officer Key was nearby "either lying fallen on the

6   ground or standing but disoriented."  Id. at 551.  "Torres' testimony that he saw

7   Key fall, thought Key had been run over, and was afraid that the van would arc

8   back around toward Key, is uncontradicted by any evidence in the record."  Id.

9   Based on the undisputed evidence, the Ninth Circuit held that Officer Torres's

10  shooting of the driver was reasonable as a matter of law: "Because the van

11  could have arced around to run over Key or Torres, or stopped and pulled

12  forward with the same effect, Torres' fear for the safety of himself and others

13  was reasonable."  Id.  See also McCullough v. Antolini, 559 F.3d 1201 (11th

14  Cir. 2009) (shooting of suspect was not excessive force where an officer was

15  pinned in his vehicle inches away from the suspect's truck when the officers

16  heard the truck's engine revving and tires spinning); Williams v. City of Grosse

17  Pointe Park, 496 F.3d 482, 486 (6th Cir. 2007) (use of deadly force held to be

18  reasonable where suspect knocked fellow officer to the ground while

19  accelerating forward onto a sidewalk and the officer "had no way of knowing

20  whether Williams might reverse the Shadow, possibly backing over Hoshaw,

21  or cause injury to other drivers or pedestrians in the area.")

22    In contrast, courts have denied motions for summary judgment on Fourth

23  Amendment claims and have declined to grant qualified immunity when

24  (1) there are disputed facts regarding whether the shooting officer was in the

25  path or in close proximity to the projected path of the approaching vehicle when

26  the officer opened fire; and (2) the evidence does not suggest that fellow

27  officers or other innocent bystanders were at immediate risk.  In Smith v. Cupp.

28  430 F.3d 766 (6th Cir. 2005), Deputy Sheriff Dunn arrested Glen Smith in a

McDonald's parking lot for making harassing telephone calls to his wife's home.
Dunn handcuffed Smith and placed Smith in the back seat of his police cruiser.
Dunn then left his vehicle to talk to a tow truck driver who had arrived to pick
up Smith's car.  Dunn left the engine of his vehicle running to provide air
conditioning.  As Dunn was talking to the tow truck driver, Smith made his way
to the front seat of the patrol car and pressed hard on the accelerator.  Dunn
fired at the driver's side of the patrol car as it was passing him, although Dunn
claimed that he fired while jumping out of the direct path of the vehicle.  Id. at
770.  Dunn contended that Smith directed the cruiser at him and that he shot
Smith in self-defense.  Id.  However, testimony of the tow truck driver
suggested that Smith was not directing the patrol car at Dunn, but, rather, was
heading toward the exit of the parking lot, and that Dunn ran toward the vehicle,
taking four or five steps, to block the exit.  Id. at 774.  The tow truck driver
stated that Dunn was not in front of the vehicle when he fired on it.  Id.  Based
on Plaintiffs' version of the facts, the Sixth Circuit held that a jury could
conclude that a reasonable officer in Dunn's position would not believe himself
to be in danger:

> Thus although events developed rapidly, under plaintiffs' version of the facts this is not a case where a dangerous situation evolved quickly to a safe one before the police officer had a chance to realize the change. . . . Instead, this is a case where a jury could conclude that Officer Dunn was not in any danger in the first place. The fact that this was a rapidly evolving situation does not, by itself, permit him to use deadly force.

Id. at 774-75.

Similarly, in Sigley v. City of Parma Heights, 437 F.3d 527 (6th Cir. 2006),
there were disputed facts regarding whether the shooting officer was running
away from an accelerating vehicle that was turning into him when he fired, or
whether the officer chased the car and ran up to the driver's side before
shooting a fatal shot into the driver's side window.  Id. at 534-36.  Given the
unresolved factual issues, the Sixth Circuit held that it was error for the district

09cv02684 BTM (WVG)

court to conclude that the car was veering toward the officer when he decided to shoot and that the officer therefore reasonably believed he was in immediate danger. Id. at 536.

Remato v. Phoenix, 2011 WL 3648268 (D. Ariz. Aug. 19, 2011), is another case with factual similarities to this case. In Remato, Gonzalo Cordova, a seventeen-year-old who was suspected of making a "beer run," attempted to flee police officers and drive out of a convenience store parking lot. Officer Sauceda fired two shots through the driver's side window. According to Sauceda, he was between 8.7 and 11.1 feet in front of the vehicle and one foot to its left immediately before the car started to accelerate toward him, leaving him one-third of a second to react to the threat posed by the vehicle, which was moving at fourteen miles per hour. Id. at *2-3. Plaintiff, on the other hand, argued that Cordova was driving past, not at Sauceda, when the shots were fired, and that Sauceda shot at Cordova because he was fleeing the crime scene, not because Sauceda was afraid of being run over. Id. at *3. Due to the disputed issues of material fact, the court denied summary judgment of Plaintiff's Fourth Amendment excessive force claim:

> Sauceda's use of deadly force would not have been "objectively reasonable" if a fact finder determines that he did not have probable cause to believe that Cordova posed a threat of serious physical harm to him or anyone else. If a fact finder decides that Cordova was attempting to escape the scene without hurting Sauceda, and that Sauceda shot at the vehicle when he was not in its path, Sauceda would not have had probable cause to believe he was in harm's way. Accordingly, his use of force would not have been justified. This comes down to a credibility determination. A fact finder could determine that Sauceda was not in reasonable apprehension of serious harm when he used deadly force against Cordova. We therefore cannot grant summary judgment on plaintiff's Fourth Amendment excessive force claim.

Id. at *4. See also Cowan v. Breen, 352 F.3d 756, 762-63 (2d Cir. 2003) (factual disputes regarding whether, at the time of the shooting, Camaro was bearing down on the officer as he signaled the Camaro to stop, precluded

resolution of whether the officer reasonably believed that the approaching vehicle put his life or person in danger).

As already discussed, there are conflicting versions of where Tripoli was standing in relation to the Jeep in the moments before the shooting occurred. According to Tripoli, he was standing behind the bumper of the Expedition, and the Jeep appeared to be accelerating in his direction.  According to Plaintiffs, however, Tripoli was safely on the passenger side of the Expedition as the Jeep began to arc past the bumper of the Expedition, and Tripoli decided to open fire even though the Jeep was clearly turning away from the Expedition toward the orchard road.  Ultimately, the outcome of Plaintiffs' excessive force claims may turn on the jury's credibility determination.  See Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002) (explaining that because the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.")

Because there are disputed issues of material facts bearing on the issue of whether a reasonable officer in Tripoli's position would have been afraid that his life was in danger, the Court cannot conclude that Tripoli's use of deadly force was reasonable as a matter of law.  Therefore, the Court denies Defendant's motion for summary judgment on Plaintiffs' Fourth Amendment claims as well as Plaintiffs' state law claims for battery and negligence, which are based on the same allegations of excessive force.[6]

---

[6] In cases involving a police officer's use of force, "[a] state law battery claim is [the] counterpart to a federal claim of excessive use of force," and for both claims, "a plaintiff must prove that the peace officer's use of force was unreasonable." Brown v. Ransweiler, 171 Cal. App. 4th 516, 527 (2009).  A victim of excessive use of force may also bring a state negligence claim because California law "recognize[s] a duty on the part of police officers to use reasonable care in deciding to use and in fact using deadly force." Munoz v. City of Union City, 120 Cal. App. 4th 1077, 1101 (2004).

B. <u>Qualified Immunity</u>

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." <u>Reichle v. Howards</u>, __U.S. __ , 132 S.Ct. 2088, 2093 (2012).  The test for qualified immunity involves two prongs.  Under the first prong, the court asks whether the facts taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  Under the second prong, the court examines whether that right was clearly established at the time of the challenged conduct. <u>Id.</u>  Either prong may be considered first.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).

To be "clearly established," the "contours of the right" violated by the official "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Saucier</u>, 533 U.S. at 201.  The "clearly established" standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" <u>Reichle</u>, 132 S.Ct. at 2093 (quoting <u>Anderson</u>, 483 U.S. at 639) (internal quotation marks omitted).

At the time of the incident, it was clearly established that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  <u>Tennessee v. Garner</u>, 471 U.S. 1, 11 (1985).  As discussed above, taking the facts in the light most favorable to Plaintiffs, a reasonable officer in Tripoli's position would not have believed that he or anyone else was in imminent danger as a result of the fleeing Jeep.  Therefore, Tripoli should

have understood that his use of deadly force violated Plaintiff's Fourth Amendment rights, and qualified immunity must be denied.  See Smith, 430 F.3d at 776-77 (affirming district court's denial of qualified immunity because "Garner and its progeny clearly establish that Dunn violated Smith's constitutional rights by shooting him when the facts support a finding that a reasonable officer in Dunn's position would not have perceived Smith endangered anyone at the scene"); Sigley, 437 F.3d at 536-37 (holding that officer was not entitled to qualified immunity as a matter of law because the officer would have had fair notice that shooting Davis in the back when he did not pose an immediate threat to other officers was unlawful); Remato, 2011 WL 3648268, at *4-5 (denying qualified immunity because under plaintiff's version of events, a reasonable officer in Sauceda's position could not have believed his conduct was lawful if the suspect was attempting to flee without jeopardizing  Sauceda's safety).

The Supreme Court case, Brousseau v. Haugen, 543 U.S. 194 (2004), which held that Graham and Garner alone did not clearly establish that Officer Brosseau violated Haugen's Fourth Amendment rights by shooting at him, is distinguishable.  In Brousseau, Officer Brousseau shot Haugen through the rear driver's side window after Haugen led her on a foot chase, jumped into his Jeep parked in a driveway, disregarded Brouseeau's commands to get out of the vehicle, started his vehicle even after Haugen broke the driver's side window with the butt of her gun and hit Haugen on the head with it, and started moving the vehicle.  Brousseau claimed that she was fearful for other officers on foot who she believed were in the immediate area, the occupants of other vehicles closeby, and other citizens who might be in the area.  Id. at 197.  The occupants of vehicles nearby  included Haugen's girlfriend and her 3-year-old daughter, who were in a small car parked in the driveway four feet away from the Jeep, and a former crime partner of Haugen's who had reported Haugen

09cv02684 BTM (WVG)

to the police for stealing tools and was sitting with his friend in a pickup parked in the street in front of the driveway, about 20 to 30 feet away from the Jeep. Id. at 196.  In summary, the situation confronted by Brousseau was "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."  Id. at 200.  In the specific context of Brousseau's case, Brousseau's actions fell in the "hazy border between excessive and acceptable force."  Id. at 201 (quoting Saucier, 533 U.S. at 206).

Here, in contrast, under Plaintiffs' version of the facts, at the time Tripoli opened fire on the Jeep, Tripoli had no reason to believe that the Jeep posed an immediate risk of death or serious danger to himself or Power, because the deputies were not in the path of the Jeep, and the Jeep was clearly turning away from the deputies toward the orchard road.  Furthermore, there were no innocent bystanders put at risk by the fleeing vehicle.  The incident took place in a secluded area at a time of morning when few people are out and about. In the specific context of this case, Graham and Garner clearly established that it would violate Plaintiffs' Fourth Amendment rights to shoot at them even though there was no risk of death or serious injury to the deputies or anyone else.  Therefore, Defendant is not entitled to qualified immunity as a matter of law.

## IV.  **CONCLUSION**

For the reasons discussed above, Defendant's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

DATED:  June 18, 2013

*Barry Ted Moskowitz*
BARRY TED MOSKOWITZ, Chief Judge
United States District Court